# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | |
| INFORMATION ASSOCIATED WITH TWO ACCOUNTS | ) | Case No.  22-SC-2023 |
| STORED AT PREMISES CONTROLLED BY | ) | |
| BITCOINTALK.ORG PURSUANT TO 18 U.S.C. § 2703 FOR | ) | |
| INVESTIGATION OF VIOLATION OF 18 U.S.C. § 1956 | ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

> See Attachment A.

Located in the jurisdiction of the _____ District of Columbia _____ , there is now concealed *(identify the person or describe the property to be seized)*:

> See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1956 (money laundering); 18 U.S.C. § 1960 (unlicensed money transmission); D.C. Code § 26-1023(c) (money transmission without a license). | |

The application is based on these facts:

> See Affidavit in Support of Application for Search Warrant.

- ❑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Leo Rovensky, Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_telephone_____ *(specify reliable electronic means)*.

Date:  _____8/9/2022_____

_____
*Judge's signature*

City and state:  _____Washington, D.C._____

Robin M. Meriweather
_____
United States Magistrate Judge

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means          ☐ Original                    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
for the
District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>INFORMATION ASSOCIATED WITH TWO ACCOUNTS<br>STORED AT PREMISES CONTROLLED BY<br>BITCOINTALK.ORG PURSUANT TO 18 U.S.C. § 2703 FOR<br>INVESTIGATION OF VIOLATION OF 18 U.S.C. § 1956 | )<br>)<br>)<br>)<br>)<br>)     Case No.  22-SC-2023 |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

        An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the jurisdiction of the _____ District of Columbia _____.
*(identify the person or describe the property to be searched and give its location)*:

  See Attachment A (incorporated by reference).

        I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

  See Attachment B (incorporated by reference).

        **YOU ARE COMMANDED** to execute this warrant on or before _____ August 23, 2022 _____  *(not to exceed 14 days)*
        ☐ in the daytime 6:00 a.m. to 10:00 p.m.  ☑ at any time in the day or night because good cause has been established.

        Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

        The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Robin M. Meriweather _____.
                                                                        *(United States Magistrate Judge)*

        ☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C.
§ 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
        ☐ for _____ days *(not to exceed 30)*  ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:  _____ 8/9/2022 _____          _____
                                                                                            *Judge's signature*

City and state:     _____ Washington, D.C. _____      _____ Robin M. Meriweather _____
                                                                                    United States Magistrate Judge

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br><br>22-SC-2023 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____


                                              _____
                                                *Executing officer's signature*


                                              _____
                                                  *Printed name and title*

## ATTACHMENT A

**Property to Be Searched**

This warrant applies to information associated with the BitcoinTalk.org accounts identified by the user accounts:

**User ID: 44692 Akemashite Omedetou (TARGET ACCOUNT 1)** and

**User ID: 37067 Killdozer (TARGET ACCOUNT 2)**

which are stored at premises owned, maintained, controlled, or operated by BitcoinTalk.org, a company that accepts service of legal process through the law firm Godfrey & Kahn, S.C., based in Madison, Wisconsin.

1

**ATTACHMENT B**

**Particular Things to Be Seized and Procedures
to Facilitate Execution of the Warrant**

I.      **Information to be disclosed by BitcoinTalk.org (the "Provider") to facilitate
        execution of the warrant**

To the extent that the information described in Attachment A (the "**Target Accounts**") is

within the possession, custody, or control of the Provider, regardless of whether such information

is located within or outside the United States, and including any messages, posts, emails, records,

files, logs, or information that has been deleted but is still available to the Provider, or has been

preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose

the following information (from **August 1, 2011, to present**) to the government for the **Target**

**Accounts** listed in Attachment A:

a.      For the time period from August 1, 2011, to the present:  The contents of all

communications and related transactional records for all PROVIDER services used by an

Account subscriber/user, including but not limited to incoming, outgoing, and draft posts,

messages, and other electronic communications; attachments to communications (including

native files); source and destination addresses and header or routing information for each

communication (including originating IP addresses); the date, size, and length of each

communication; the date on which the account was created, the length of service, the status of

the account (including whether the account is inactive or closed), the services utilized, the email

address(es) used to register the account; and any user or device identifiers linked to each

communication (including phone numbers or cookies);

b.      For the time period from August 1, 2011, to the present: The contents of all other

data and related transactional records for all PROVIDER services used by an Account user,

including any information ever generated, modified, or stored by the user(s) or PROVIDER

through the Account (such as contacts, calendar data, images, videos, notes, documents,

bookmarks, profiles, and any other saved information);

c.      For the time period from August 1, 2011, to the present: All PROVIDER records

concerning the online search and browsing history associated with the Account or its users (such

as information collected through tracking cookies);

d.      For the time period from August 1, 2011, to the present: All records and other

information concerning any document or other file created, stored, revised, or accessed in

connection with the Account or by an Account user, including the contents and revision history

of each document or other computer file, and all records and other information about each

connection made to or from such document or other computer file, including the date, time,

length, and method of connection; server log records; data transfer volume; and source and

destination IP addresses and port numbers;

e.      All records regarding identification of the Account, including names, addresses,

telephone numbers, alternative email addresses provided during registration, means and source

of payment (including any credit card or bank account number), records of session times and

durations (including IP addresses, cookies, device information, and other identifiers linked to

those sessions), records of account registration (including the IP address, cookies, device

information, and other identifiers linked to account registration), length of service and types of

services utilized, account status, methods of connecting, and server log files, and including any

such information that was previously associated with the account at any time and a record of any

changes made to the account;

f.      All device or user identifiers which have ever been linked to the Account, including but not limited to all cookies and similar technologies, Android ID, Advertising ID, unique application number, hardware model, operating system version, device serial number, Global Unique Identifier ("GUID"), mobile network information, telephone number, Media Access Control ("MAC") address, and International Mobile Equipment Identity ("IMEI"), as well as all apps that have been downloaded to the device, location history, any backup or cloud copies of data stored on the device, and basic subscriber information for all Provider accounts ever tied to the device;

g.      For the time period from August 1, 2011, to the present:  All records of communications between PROVIDER and any person regarding the Account, including contacts with support services and records of actions taken;

h.      Basic subscriber records and login history (including, as described in 18 U.S.C. § 2703(c)(2), names, addresses, records of session times and durations, length of service and types of service utilized, instrument number or other subscriber number or identity, and payment information) concerning any PROVIDER account (including both current and historical accounts) ever linked to the Account by a common e-mail address (such as a common recovery e-mail address), or a common telephone number, means of payment(*e.g.*, credit card number), registration or login IP addresses (during a period of one week), registration or login cookies or similar technology, or any other unique device or user identifier, including GUID and Advertising ID;

i.      Any communications between the operator of the Account and the PROVIDER, including customer support; and

j.      Information about any complaints, alerts, or indications of malware, fraud, suspicious activity, or violations of terms of service connected to the Account or associated user(s), including any memoranda, correspondence, investigation files, or records of meetings or discussions about the Account or associated user(s) (but not including any confidential communications with legal counsel).

//

//

//

Within 14 days of the issuance of this warrant, PROVIDER shall deliver the information set forth above via United States mail, courier, or email to the following:

Leo Rovensky
Special Agent
Internal Revenue Service
Leo.Rovensky@ci.irs.gov
973-885-4062

II.     **Information to be Seized by Law Enforcement**

All information described above in Section I that constitutes evidence, fruits, contraband, and instrumentalities of violations of 18 U.S.C. §§ 1956 (Money Laundering) and 1960 (Unlicensed Money Service Business) and D.C. Code § 26-1023(c) (money transmission without a license), and including information pertaining to the following matters:

a.  Information that constitutes evidence of the identification or location of the user(s) of the TARGET ACCOUNTS;

b.  Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation and underlying specified unlawful activities; or (ii) communicated with the TARGET ACCOUNTS about matters relating to the criminal activity under investigation and underlying specified unlawful activities, including records that help reveal their whereabouts;

c.  Information that constitutes evidence concerning how and when the TARGET ACCOUNTS were accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the criminal activity under investigation and to the TARGET ACCOUNTS user(s);

d.  Information concerning the development and operation of Bitcoin Fog, or any associated site or service;

e.  Information concerning how the person(s) developing and operating Bitcoin Fog, or any associated site or service aided and abetted and/or conspired with users of

5

those services in furtherance of criminal offenses, as described in the affidavit submitted in support of this Warrant;

f.   Records and information relating to individuals associated with the TARGET ACCOUNTS, including the identity or location of owners, administrators, moderators, and operators, aiders and abettors, coconspirators, and accessories after the fact, and the identity of the users of the TARGET ACCOUNTS or any similar/related website, as well as communications by or among those individuals;

g.   Information regarding the individual(s) using the TARGET ACCOUNTS;

h.   Records and information relating to the users of the TARGET ACCOUNTS or any similar/related accounts, including customer lists, contacts, and identifying information, as well as communications by or among those individuals;

i.   Evidence related to banking or financial information, including but not limited to:

    i.   Evidence related to any virtual currency data or transaction, including the details and context of any such transaction;

    ii.   Evidence related to the transportation or transmission of funds, including virtual currencies (such as bitcoin), that have been derived from the investigated crimes, including those that are intended to be used to promote, conceal, or support further criminal activity;

    iii.   Financial account information, cryptocurrency records, bank records, bank statements, credit card bills, bank account numbers, money drafts, letters of credit, money orders, cashier's checks, or bank checks;

    iv.   means or source of payment for service (including any credit card, bank

6

account number, or bitcoin wallet addresses);

    v. any other financial records or items evidencing the obtaining, secreting, transfer, concealment, storage and/or expenditure of money;

j. Evidence related to conducting, controlling, managing, supervising, directing, and/or owning all or part of an unlicensed money transmitting business;

k. Evidence related to money transmitting licenses and business registration;

l. The identity of the persons who communicated with the TARGET ACCOUNTS about matters relating to conducting, controlling, managing, supervising, directing, and/or owning all or part of an unlicensed money transmitting business, including records that help reveal their whereabouts;

m. Evidence indicating the state of mind of the TARGET ACCOUNTS user(s), *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation.

**III. Government procedures for warrant execution**

The United States government will conduct a search of the information produced by the Provider and determine which information is within the scope of the information to be seized specified in Section II. That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the Provider that does not fall within the scope of Section II and will not further review the information absent an order of the Court. Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

8

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH TWO ACCOUNTS STORED AT PREMISES CONTROLLED BY BITCOINTALK.ORG PURSUANT TO 18 U.S.C. § 2703 FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. § 1956** | **SC No. 22-SC-2023** |

*Reference:      USAO Ref. # 2015R02056; Subject Account: BitcoinTalk Accounts Akemashite Omedetou (User ID: 44692) and Killdozer (User ID: 37067)*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Leo Rovensky, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a warrant to search information associated with BitcoinTalk.org accounts:  Akemashite Omedetou, User ID: 44692 ("**TARGET ACCOUNT 1**") and Killdozer, User ID: 37067 ("**TARGET ACCOUNT 2**"), which are stored at premises controlled by BitcoinTalk.org ("PROVIDER"), a company based in the United States and which responds to U.S. legal process through their legal counsel based in Madison, Wisconsin. The information to be searched is described in the following paragraphs and in Attachment A.

2.      This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require PROVIDER to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.

1

3.      I am a Special Agent with the Internal Revenue Service, Criminal Investigation (IRS-CI).  I have been a Special Agent with IRS-CI since 2008.  My responsibilities include the investigation of criminal violations of the Internal Revenue Code (Title 26, United States Code), the Money Laundering Control Act (Title 18, United States Code, Sections 1956 and 1957), the Bank Secrecy Act (including relevant parts of Title 31, United States Code), and related offenses. I have experience investigating crimes involving virtual currency and am currently assigned to the Cyber Crimes Unit within IRS-CI.  I am experienced in analyzing and tracing virtual currency transactions.  I have also received training in cyber operations and in criminal schemes perpetrated via the Internet.  During my work with the IRS-CI, I have been the affiant on, executed, and/or participated in the execution of search warrants, and have seized evidence associated with violations of federal and state laws.

4.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. §§ 1956 (money laundering) and 1960 (unlicensed money transmission) and D.C. Code § 26-1023(c) (money transmission without a license) have been committed by the user(s) of the TARGET ACCOUNTS.  There is also probable cause to search the information described in Attachment A for evidence of these crimes further described in Attachment B.

## JURISDICTION

6.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, DC. *See* 18 U.S.C. § 3237.  Additionally, the criminal offenses under investigation began or were committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district. *See* 18 U.S.C. § 3238. Further, the statute setting forth one of the federal offenses under investigation, namely 18 U.S.C. § 1956, applies extraterritorially.

## BACKGROUND RELATED TO VIRTUAL CURRENCY

### I.      Bitcoin

7.      Bitcoin ("BTC") is a decentralized virtual currency, which is circulated over the Internet and which is not backed by a government.  BTC is supported by a peer-to-peer network. All transactions are recorded on BTC's public ledger, called the blockchain.  Although transactions are visible on the public ledger, each transaction is only listed by a complex series of letters and numbers that does not identify the individuals involved in the transaction.  This feature makes virtual currency transactions pseudo-anonymous; however, it is sometimes possible to determine the identity of an individual involved in a virtual currency transaction by analyzing the blockchain and obtaining related records.  For this reason, many criminal actors who use virtual currency to facilitate illicit transactions online (*e.g.*, to buy and sell illegal drugs or other unlawful items or services) look for ways to make their transactions even more anonymous.

3

8.     BTC is sent to and from virtual currency "addresses," roughly equivalent to anonymous account numbers.  One person may easily create and control many BTC addresses. Like sending and receiving an email via an email address, a user can send and receive BTC via a BTC address.  People commonly have many different BTC addresses, and an individual could theoretically use a unique address for every transaction in which they engage.  A user can also send BTC from multiple addresses in one transaction; however, to spend virtual currency held within a BTC address, the user must have a private key, which is generated when the address is created and is shared only with the address key's initiator.  Similar to a password, a private key ensures secured access to the virtual currency.  Consequently, only the holder of a private key for a virtual currency address can spend from the address.  Although the owners of virtual currency addresses generally are not known unless the information is made public by the owner (*e.g.*, by posting the address in an online forum or providing the address to another user for a transaction), analyzing the blockchain can sometimes lead to identifying both the owner of an address and other accounts that the person or entity owns and controls.

9.     Virtual currency is often transacted using a virtual currency exchange ("VCE"), which typically acts as a trading platform and storage platform.  Most VCEs facilitate trading between the U.S. dollar, other fiat currencies, BTC, and other virtual currencies.  Many VCEs also

store their customers' virtual currency in virtual currency "wallets."[1]   These wallets can hold

multiple BTC addresses associated with a user on a VCE's network.

10.     Because these VCEs act as money services businesses, they are legally required,

under the Bank Secrecy Act, codified at 31 U.S.C. § 5311 *et seq*., to conduct due diligence of their

customers (*i.e.*, Know Your Customer ("KYC") checks).   They are also required to have anti-

money laundering ("AML") programs in place.   In other words, a U.S.-based VCE is required to

collect identifying information of their customers and verify their clients' identities.

11.     Since the BTC blockchain serves as a searchable public ledger of every BTC

transaction, investigators may trace transactions to VCEs.   Because those VCEs collect identifying

information about their customers, subpoenas or other appropriate legal process submitted to these

VCEs can, in some instances, reveal the true identity of the individual responsible for the

transaction.

## II.     Blockchain Analysis

12.     As previously stated, while the identity of a BTC address owner is generally

anonymous, law enforcement can often identify the owner of a particular BTC address by

analyzing the BTC blockchain.   The analysis can also reveal additional addresses controlled by the

same individual or entity.   "For example, when an organization creates multiple Bitcoin addresses,

---

[1] BTC wallets hosted by third parties (*e.g.*, VCEs) are sometimes called "hosted wallets," because
the third party holds a customer's funds on the third party's platform until a customer requests that
the third party release the funds for a transaction.   This is similar to the relationship a customer has
with a bank: the bank holds the customer's funds until the customer requests a transfer. I n contrast,
virtual currency wallets that allow a user to exercise total, independent control over their funds
(*i.e.*, do not require a third party's involvement to facilitate a transaction) are called "unhosted" or
"self-hosted" wallets.

it will often combine its [BTC] addresses into a separate, central [BTC] address (*i.e.*, a "cluster"). It is possible to identify a 'cluster' of [BTC] addresses held by one organization by analyzing the [BTC] blockchain's transaction history.  Open source tools and private software products can be used to analyze a transaction." *United States v. Gratkowski*, 964 F.3d 307, 309 (5th Cir. 2020).

13.    Law enforcement uses commercial services offered by several different blockchain-analysis companies to investigate virtual currency transactions.  These companies analyze the BTC blockchain (as well as the blockchains for other virtual currencies) and attempt to identify the individuals or groups involved in transactions.  Through numerous unrelated investigations, law enforcement has found the information provided by these companies to be reliable.

### III.    The Tor Network

14.    The Tor network is designed specifically to facilitate anonymous communication over the Internet.  In order to access the Tor network, a user must install Tor software either by downloading an add-on to the user's web browser or by downloading the free "Tor browser bundle" available at www.torproject.org.  Use of the Tor software bounces a user's communications around a distributed network of relay computers run by volunteers all around the world, thereby masking the user's actual Internet Protocol ("IP") address, which could otherwise be used to identify a user.

15.    Because of the way Tor routes communications through other computers, traditional IP identification techniques are not viable.  Meaning, when a user on the Tor network accesses a website, for example, the IP address of a Tor "exit node," rather than the user's actual IP address, shows up in the website's IP log.  An exit node is the last computer through which a

6

user's communications were routed.  There is no practical way to trace the user's actual IP address back through that Tor exit node IP address.

16.     Within the Tor network itself, entire websites can be set up as "hidden services." "Hidden services" operate in the same way as regular public websites with one critical exception: the IP address for the web server is hidden and instead is replaced with a Tor-based web address, which is a series of algorithm-generated characters, such as "asdlk8fs9dflku7f" followed by the suffix ".onion."  A user can only reach these "hidden services" if the user is employing the Tor client and operating in the Tor network.  And, unlike an open, public Internet website, it is not possible to determine the IP address of a computer hosting a Tor "hidden service" by using publicly available lookup tools.  As a result, neither law enforcement nor Tor users can determine the location of the computer that hosts such a website through those public lookups.

## IV.     Darknet Markets

17.     "Darknet markets" are commercial websites that are typically hosted as Tor hidden services.  Darknet markets primarily function as black markets where one can sell or broker transactions involving illegal drugs, cybercriminal tools (*e.g.*, malware), weapons, counterfeit currency, stolen personally identifiable information, forged documents and identification credentials, and other illicit goods and services.  BTC is the most common method of payment for products and services procured on darknet markets.

18.     Two publicly available examples of now defunct darknet markets that operated as Tor hidden services are Silk Road Market ("Silk Road") and AlphaBay Market ("AlphaBay"). Silk Road was the first modern darknet market.  It was best known as a platform for buying and

selling illegal drugs.  It was in operation from approximately 2011 until 2013, when it was shut down following a long-term U. S. law enforcement investigation.

19.     AlphaBay was active from approximately 2014 until 2017, when it was shut down following an investigation conducted by U.S. authorities.  While active, AlphaBay had more than 400,000 users.  Like Silk Road, AlphaBay was a popular forum for buying and selling illegal drugs. Below is a screenshot of what AlphaBay looked like while operational:



## PROBABLE CAUSE

20.     The Internal Revenue Service, Criminal Investigation (IRS-CI) and the Federal Bureau of Investigation (FBI) have been investigating an illicit Bitcoin money transmitting and money laundering service called BITCOIN FOG.     As described further below, the investigation identified Roman STERLINGOV as the operator of BITCOIN FOG.   On April  26,  2021, STERLINGOV was charged by complaint in the District of Columbia with money laundering, in violation of 18 U.S.C. § 1956(a)(3); unlicensed money transmission, in violation of 18 U.S.C.§ 1960; and  money  transmission  without  a  license,  in  violation  of

D.C. Code § 26-1023(c). STERLINGOV was arrested shortly after midnight on April 27, 2021, after he traveled from Moscow to the Los Angeles International Airport. On June 14, 2021, a grand jury in the District of Columbia returned and indictment charging STERLINGOV with the same counts as the complaint. On July 18, 2022, a grand jury in the District of Columbia returned a superseding indictment, adding a count of money laundering conspiracy in violation of 18 U.S.C. § 1956(h).

**BITCOIN FOG Background**

21.    BITCOIN FOG was an Internet-based service accessible from the District of Columbia and U.S. states. As of April 26, 2021, BITCOIN FOG could be accessed through the Tor hidden service located at http://foggeddriztrcar2.onion.[2]   BITCOIN FOG functioned as a Bitcoin "tumbler" or "mixer" service.[3]   It allowed users to send bitcoins to designated recipients in a manner designed to conceal and obfuscate the source of the bitcoins.   It worked by disassociating incoming bitcoin from particular Bitcoin addresses or transactions and then comingling that bitcoin with other incoming bitcoin prior to conducting any further transactions. This process allowed BITCOIN FOG customers engaged in unlawful activities to launder their proceeds by concealing the nature, source, and location of their "dirty" bitcoin. BITCOIN FOG publicly advertised this service as a way to help users obfuscate the source of their bitcoin. BITCOIN FOG charged customers a fee for this service.

22.    BITCOIN FOG was launched on or about October 27, 2011, and was operational as of April 26, 2021. The site went down shortly after STERLINGOV's arrest. The website was one of the original Bitcoin tumbling sites on the darknet. As described below, more than 1.2 million BTC (valued at approximately $335,809,383 at the time of the transactions) were sent

through the site from in or about October 2011 through April 26, 2021. The largest senders of BTC through BITCOIN FOG were darknet markets, such as Agora, Silk Road 2.0, Silk Road, Evolution, and AlphaBay, that primarily trafficked in illegal narcotics and other illegal goods.

23. BITCOIN FOG was publicly advertised on Internet forums and well-known web pages promoting darknet markets as a tool for anonymizing bitcoin transactions. The administrator of BITCOIN FOG publicly promoted the service through a clearnet site (www.bitcoinfog.com and www.bitcoinfog.info) and a Twitter page. These outlets allowed users to easily locate and access the hidden services site through simple clearnet Internet searches.

**BITCOIN FOG Operated as an Illegal Money Transmitting and Money Laundering Service on the Darknet**

24. Using blockchain analysis, law enforcement confirmed that over 1.2 million BTC (valued at approximately $335,809,383 at the time of the transactions) have been sent through BITCOIN FOG since the site was launched in 2011. This figure includes BTC from various sources: all direct and indirect transactions from sources such as darknet markets; funds stolen from other bitcoin addresses through hacks; direct deposits and withdrawals from bitcoin wallets; sends and receives from wallets not apparently affiliated with a known hosted service; and other unknown sources. IRS-CI personnel reviewed all inputs and outputs from BITCOIN FOG to identify bitcoins sent directly to BITCOIN FOG from known darknet markets and bitcoins sent from BITCOIN FOG to known darknet markets. IRS-CI's analysis determined BITCOIN FOG received approximately 486,861.69 BTC (approximately $54,897,316.44 at the time of the transactions) *directly* from darknet markets. BITCOIN FOG sent approximately 164,931.13 BTC (approximately $23,690,956.28 at the time of the transactions) *directly* to darknet markets.

10

In sum, BITCOIN FOG sent or received more than $78 million in transactions involving known darknet markets, counting only direct transactions.

25.     Among these, IRS-CI cyber analysts identified direct deposits into BITCOIN FOG from at least 35 darknet markets.  Below are the top five markets by U.S. dollar value of deposits:

| Source Market | Total Received (BTC) | Total Received (USD) |
|---|---|---|
| Agora Market | 41,966.87 | $14,398,754.73 |
| Silk Road 2.0 Market | 22,863.74 | $12,518,636.97 |
| Silk Road Marketplace | 377,102.74 | $9,556,159.49 |
| Evolution Market | 11,100.79 | $3,199,542.15 |
| AlphaBay Market | 5,442.86 | $2,907,508.67 |

26.     IRS-CI cyber analysts identified funds sent directly from BITCOIN FOG to at least 51 different darknet markets. Below are the top five markets by dollar value of sends:

| Destination Market | Total Sent (BTC) | Total Sent (USD) |
|---|---|---|
| Agora Market | 26,398.12 | $8,680,430.34 |
| Silk Road 2.0 Market | 11,274.21 | $5,871,831.33 |
| Silk Road Marketplace | 106,522.77 | $2,289,509.42 |
| Evolution Market | 6,473.24 | $1,860,053.75 |
| AlphaBay Market | 3,375.90 | $1,557,931.95 |

27.     Based on my training and experience, including experience in other darknet investigations, darknet markets exist primarily to traffic in illegal narcotics and other illegal goods and services – a fact well-known among darknet market user and administrators, and intended by the administrators.  In particular, darknet markets sell stolen personally identifiable information, financial information including credit card numbers, and computer hacking tools and exploits. That the darknet markets listed above primarily traffic in illegal narcotics and the other illegal

goods and services noted would be apparent to anyone using the markets because the categories listed on each market, and the majority of specific listings, openly discuss illegal goods and services. I am familiar with each of the darknet markets listed in the tables above and am aware that illegal narcotics and other illegal goods and services constituted the majority of items for sale on each market. Accordingly, there is probable cause to believe that the bitcoin transactions sent to and from BITCOIN FOG involved the proceeds of "specified unlawful activity," as defined in 18 U.S.C. § 1956(c)(7), such as narcotics distribution (21 U.S.C. § 841); identity theft and the sale of stolen personally identifiable information (PII) (18 U.S.C. § 1028A); and computer fraud and abuse, including the sale of computer hacking tools and exploits (18 U.S.C. § 1030).

**Undercover Transactions on BITCOIN FOG**

*September 2019 Undercover Transaction*

28. On or about September 11, 2019, an IRS-CI Special Agent (UC) physically located in the District of Columbia and operating in an online undercover capacity accessed BITCOIN FOG at foggeddriztrcar2.onion through the Tor browser. The UC created an account through the registration page by creating a username and password and entering a security text phrase pictured below the registration text boxes. The registration page of BITCOIN FOG stated: "As an anonymous service, we do not collect any additional information about you besides a user name and password."

29. When creating the account, the UC was never asked for any identifying information such as an email account, date of birth, social security number, or passport number, or for any other proof of identification.

30. On or about September 11, 2019, while physically located in the District of

12

Columbia, the UC sent approximately 0.02488936 BTC ($249.99) from an IRS-CI controlled covert wallet ("UC Sending Wallet") into a wallet address provided by BITCOIN FOG.

31.     On or about September 12, 2019, while physically located in the District of Columbia, the UC accessed foggeddriztrcar2.onion.   The UC's undercover BITCOIN FOG account showed a balance of approximately 0.02425700.   The difference of approximately 0.00063236 BTC between the amount the UC deposited and the balance shown is approximately 2.5% of the total deposit.  This is the service fee charged by BITCOIN FOG.  On or about September 12, 2019, while physically located in the District of Columbia, the UC sent 0.02 BTC from BITCOIN FOG to an IRS-CI controlled covert wallet ("UC Receiving Wallet").

32.     Through blockchain analysis, investigators traced bitcoin from the BITCOIN FOG deposit address to known BITCOIN FOG bitcoin clusters identified through blockchain analysis.  IRS-CI investigators also traced bitcoin sent to the UC Receiving Wallet and confirmed that the bitcoin was sourced from BITCOIN FOG clusters.

33.     Investigators were unable to directly trace any direct link between the "UC Sending Wallet" and the "UC Receiving Wallet," confirming that BITCOIN FOG successfully tumbled the transaction by breaking the link in the blockchain between the source and ultimate destination of the funds.

***November 2019 Undercover Transaction***

34.     On or about November 18, 2019, while physically located in the District of Columbia, an IRS-CI Special Agent (UC) operating in an online undercover capacity sent approximately 0.01173987 BTC to BITCOIN FOG from an IRS-CI controlled undercover

13

account on the Apollon darknet market.  Apollon was a darknet market known to sell illegal narcotics, stolen PII, and other illegal items.  On November 19, 2019, while physically located in the District of Columbia, the SA accessed BITCOIN FOG at foggeddriztrcar2.onion.  The UC's undercover account on BITCOIN FOG showed that the account had been credited by the amount of the send transaction, less an approximately 2.32% fee.

35.     On or about November 19, 2019, while physically located in the District of Columbia and after confirming the deposit of funds from Apollon Market had been credited to the UC's BITCOIN FOG account, the UC sent the message below to the BITCOIN FOG administrator using the messaging function on the BITCOIN FOG site, stating the funds were the proceeds of illegal narcotics sales:

36.     On or about November 21, 2019, while physically located in the District of Columbia, the UC again accessed BITCOIN FOG operating in an online undercover capacity. There was no response to the above message posted by the SA on or about November 19, 2019.

The UC then directed BITCOIN FOG to send 0.01146764 BTC from the undercover account on BITCOIN FOG to an IRS-CI controlled undercover wallet.  BITCOIN FOG did so.

37.     The UC clearly stated that the BTC was from the sale of ecstasy/molly, an illegal narcotic.  At no point did the administrator of BITCOIN FOG prevent the deposit of funds from Apollon or prevent the withdrawal of funds after the funds were represented to be the proceeds of illegal drug sales.

38.     Through blockchain analysis, investigators traced bitcoin from the IRS-CI controlled account on Apollon Market, to the BITCOIN FOG deposit address, to known BITCOIN FOG bitcoin clusters identified through blockchain analysis.  IRS-CI investigators also traced bitcoin sent to the IRS-CI controlled undercover wallet and confirmed that the bitcoin was sourced from a BITCOIN FOG address.

***March-April 2021 Undercover Transaction***

39.     On or about March 10, 2021, while physically located in the District of Columbia, an IRS-CI Special Agent (UC) operating in an online undercover capacity accessed BITCOIN FOG.  The UC sent three separate deposits to BITCOIN FOG in the amounts of 0.0043444 BTC, 0.00836095 BTC, and 0.0089869 BTC.

40.     On or about April 19, 2021, while physically located in the District of Columbia, the UC contacted the administrator of BITCOIN FOG and advised that the deposited funds were the proceeds of a COVID fraud scheme, stating: "I am in need of partner.  I have many targets in US for my attack. I develop program to lock government corona checks until persons pay me bitcoin ransom. These are first three deposits to the fog."

41.     The UC clearly stated that the BTC was from a COVID fraud.  At no point did the

15

administrator of BITCOIN FOG prevent the use of BITCOIN FOG to launder funds that were represented to be illicit proceeds.

## BITCOIN FOG Is Not Registered with FinCEN or Licensed in the District of Columbia

42.     Records from the Financial Crimes Enforcement Network ("FinCEN"), a division of the U.S. Department of Treasury, revealed that neither ROMAN STERLINGOV nor BITCOIN FOG was registered as a money services business under federal law, despite conducting transactions with U.S.-based customers.   Similarly, records from the District of Columbia Department of Insurance and Banking (DISB) revealed that neither ROMAN STERLINGOV nor BITCOIN FOG was licensed as a money transmitter under District of Columbia law, despite conducting transactions with persons based in the District of Columbia.

## Attribution of BITCOIN FOG to ROMAN STERLINGOV

43.     Analysis of bitcoin transactions, financial records, Internet service provider records, e-mail records, and additional investigative information identified ROMAN STERLINGOV as the principal operator of BITCOIN FOG.

### *"Akemashite Omedotou" and the Shormint@hotmail.com Account*

44.     Early in the investigation, identifiers connected BITCOIN FOG to the pseudonym Akemashite Omedotou and the email account shormint@hotmail.com.   As discussed further below, BITCOIN FOG's launch was announced in a posting on the BitcoinTalk.org forum on or about October 27, 2011, by a user called Akemashite Omedetou.   Records from BitcoinTalk.org for the account associated with Akemashite Omedetou revealed that the account was created on or about October 25, 2011, using email address shormint@hotmail.com.   The account registration

16

information   included   the   website   title   "Bitcoin   Fog"   and   website   URL

http://www.bitcoinfog.com.

***Connecting the BITCOIN FOG Domain to STERLINGOV***

45.     Additional investigation, as described below, connects STERLINGOV to the

original BITCOIN FOG clearnet domain.

46.     According to publicly available WhoIs information, www.bitcoinfog.com was

registered through the web hosting service Highhosting.net on October 25, 2011.  The WhoIs

records showed that the domain was registered to "Akemashite Omedetou" using email address

shormint@hotmail.com.  Records from Highhosting.net revealed that Akemashite Omedetou

used a Liberty Reserve account (Liberty Reserve Account 1) to pay for the domain.  Liberty

Reserve   records   showed   that   Liberty   Reserve   Account   1   was   registered   to

shormint@hotmail.com.

47.     Investigators reviewed the account activity associated with Liberty Reserve

Account 1 and determined that STERLINGOV had funded the account using a series of layered

transactions through multiple payment platforms, performed in close temporal proximity and

apparently designed to make it difficult to trace the payment to his true identity.  Specifically:

a.   On September 29, 2011, according to records from the virtual currency exchange

Mt. Gox, Roman STERLINGOV opened an account in his true name at Mt. Gox (Mt. Gox

Account 1), using the email address plasma@plasmadivision.com.

b.   On October 3, 2011, STERLINGOV funded Mt. Gox Account 1 with 100 euros.

c.   On October 19, 2011, Mt. Gox Account 1 sent 36 BTC through an off-platform Bitcoin address to a second Mt. Gox Account (Mt. Gox Account 2) (registered to "nfs9000@hotmail.com").

d.   On October 20, 2011, Mt. Gox Account 2 sent 35 BTC to a third Mt. Gox Account (Mt. Gox Account 3) (registered to "kolbasa99@rambler.ru").

e.   On October 20, 2011, Mt. Gox Account 3 sent $80 USD to an account at Aurum Xchange (Aurum Xchange Account 1), another digital payment platform.

f.   On October 20, 2011, Aurum Xchange Account 1 sent $76 USD to Liberty Reserve Account 1.

g.   On October 25, 2011, Liberty Reserve Account 1 paid the domain fees for www.bitcoinfog.com to Highhosting.net.

This series of transactions is depicted in the below chart:



48.    An analysis of the IP addresses used to access the above Liberty Reserve and Mt. Gox accounts confirmed that the accounts shared a common owner: STERLINGOV.   For example, IP logs from Mt. Gox and Liberty Reserve showed that on November 24, 2011, a user using the IP address 212.117.160.123 logged into Mt. Gox Account 2, Mt. Gox Account 3, and

18

Liberty Reserve Account 1, as well as another Liberty Reserve account registered to Roman STERLINGOV (Liberty Reserve Account 2).   STERLINGOV was also the named account owner of a third Liberty Reserve account (Liberty Reserve Account 3) registered using the email address heavydist@gmail.com (Google Account 1).

49.   Liberty Reserve records revealed that Liberty Reserve Account 2 was registered in STERLINGOV's true name using the email address plasma@plasmadivision.com, the same e-mail tied to Mt. Gox Account 1.   The account registration information included a residential address in Gothenburg, Sweden corresponding to STERLINGOV's home address.   Both Liberty Reserve Account 2 and Liberty Reserve Account 3 were registered using a Swedish telephone number, TELEPHONE NUMBER 1, which Swedish telecommunications provider records revealed is registered to STERLINGOV.

50.   On August 25, 2012, Mt. Gox Account 1 received a 180 BTC deposit sent from an account at BTC-e (BTC-e Account 1).   BTC-e was a virtual currency exchange that catered to criminals and that was shut down by law enforcement in 2017.   According to records from BTC-e, BTC-e Account 1 was registered to Roman STERLINGOV, using Google Account 1.

51.   Records from Google pertaining to Google Account 1 revealed that the account was registered to "Roman Heavydist" and was linked to TELEPHONE NUMBER 1, identified above as STERLINGOV's phone number.   Investigators obtained the contents of Google Account 1 pursuant to a lawfully authorized search warrant.   Google Account 1's Google Drive folder contained Russian language document titled Ввод денег ("Putting Money"), dated September 29, 2011 (less than a month prior to the launch of BITCOIN FOG).   A translation of the document showed that the document appeared to be notes taken by STERLINGOV describing

19

how to layer funds. The steps outlined in the document match the steps that STERLINGOV took to pay for the domain www.bitcoinfog.com. The below chart displays the relevant text of the document overlaid on the transaction path used by STERLINGOV to pay for the BitcoinFog.com domain.



*STERLINGOV's Receipt of Proceeds from BITCOIN FOG*

52.     BITCOIN FOG charged a variable fee of 2% to 2.5% on each deposit. Blockchain analysis revealed that these fees were retained within the BITCOIN FOG cluster, and that the administrator made periodic withdrawals from the BITCOIN FOG cluster to pay himself. These withdrawals occurred sporadically and in the same manner as a regular user. The withdrawals appeared to be concealed to blend in with regular mixing transactions in order to protect the site administrator from scrutiny. Based on BITCOIN FOG's transaction activity over time, STERLINGOV would have made approximately $8 million in commissions from BITCOIN FOG transactions if he had cashed out the administrative fees near the time that the transactions occurred. Due to the significant increase in value of bitcoin over the course of BITCOIN FOG's

operation—from a low of approximately $2 shortly after BITCOIN FOG launched in fall 2011 to a top value of $69,000 during 2021, and current value of $20,000—STERLINGOV was able to reap significant appreciation from his profits that were kept in bitcoin.

53.     IRS-CI examined bitcoin accounts controlled by STERLINGOV at several cryptocurrency exchanges.  Analysis of Sterlingov's accounts revealed the vast majority of cryptocurrency deposited into his accounts was originally sourced and traced back to BITCOIN FOG.  STERLINGOV utilized a variety of methods to remove BTC from BITCOIN FOG, including conducting direct transfers to exchange accounts held in his name, withdrawing funds from BITCOIN FOG to intermediary BTC wallets before cashing out BTC through exchanges, and using BTC from BITCOIN FOG to purchase goods and services, gift cards, and other cryptocurrencies.

**Akemashite Omedetou (TARGET ACCOUNT 1)**

54.     BITCOIN FOG's launch was announced in an October 27, 2011, posting titled "[ANNOUNCE] Bitcoin Fog: Secure Bitcoin Anonymization" on the BitcoinTalk.org online forum.  BitcoinTalk.org was a popular forum for Bitcoin users.  The announcement was posted by a user with the pseudonym Akemashite Omedetou (Japanese for "Happy New Year") (TARGET ACCOUNT 1) and included links to a clearnet website for BITCOIN FOG (www.bitcoinfog.com), the Tor onion site (http://foggeddriztrcar2.onion), and a Twitter feed for updates on the site (www.twitter.com/#!/@Bitcoinfog).

55.     The announcement post by TARGET ACCOUNT 1 described BITCOIN FOG as a tool to make it difficult for "interested parties, be it authorities or just interested researchers" to trace users' Bitcoin transactions across the Bitcoin network.  The post stated that BITCOIN FOG:

"mix(es) up your bitcoins in our own pool with other users…get paid back to other accounts from our mixed pool…can eliminate any chance of finding your payments and making it impossible to prove any connection between a deposit and a withdraw inside our service."

56.     After announcing the launch of BITCOIN FOG, TARGET ACCOUNT 1 continued to post on BitcoinTalk.org, extolling the anonymizing features of BITCOIN FOG and providing updates on the service.  For example, on or about November 11, 2011, in response to an online comment that questioned a design feature of BITCOIN FOG, TARGET ACCOUNT 1 stated: "should we make it easier…to do statistical analysis on our payouts…to help[ing] them start finding our bitcoin client? (that could only be done by an authority of course…) We won't make their life easier."

57.     In another post, dated on or about February 9, 2012, TARGET ACCOUNT 1 responded to a comment from a poster about using mainstream Bitcoin exchanges to mix virtual currency.  TARGET ACCOUNT 1 stated: "most of them [exchanges] are also run as legitimate, visible businesses, which will be forced to reveal information about your funds, should such a request be made by the authorities…us on the other hand, the authorities have to find first, which, as Silk Road have [sic] demonstrated, can prove problematic."

58.     The Twitter account @BitcoinFog was established on or about October 27, 2011, the date on which BITCOIN FOG was launched.  The @BitcoinFog account regularly posted updates regarding the status of the BITCOIN FOG hidden site, including tweeting a link on November 14, 2014, to http://foggeddriztrcar2.onion, the hidden services address for BITCOIN FOG.

59.     The @BitcoinFog account also tweeted links to stories discussing why users

22

should tumble bitcoins—in order to thwart law enforcement.  For example, on or about September 13, 2017, the @BitcoinFog account tweeted a link to a story about the IRS using blockchain analysis software to track bitcoin.  On or about June 11, 2019, @BitcoinFog tweeted a link to a Europol press release announcing the law enforcement takedown of Bestmixer.io, another Bitcoin mixer/tumbler, commenting: "this is why you need to use ONLY a Tor-based mixing service (Such a surprise)."

**Killdozer ("TARGET ACCOUNT 2")**

60.     Further investigation revealed that STERLINGOV held a second account at BitcoinTalk.org, using the username "Killdozer" (TARGET ACCOUNT 2), for his own personal activity.  Records from BitcoinTalk.org for TARGET ACCOUNT 2 revealed that the account was created on or about August 3, 2011, using email address Jordan.butch@mail.ru.

61.     Between approximately August 2011 until approximately October 2013, TARGET ACCOUNT 2 made over 200 forum posts.  The vast majority of these posts involved TARGET ACCOUNT 2 participating in discussions about various bitcoin topics.  Some of the bitcoin topics discussed by TARGET ACCOUNT 2on BitcoinTalk.org included the scalability of bitcoin, government regulation, privacy, and money laundering.  TARGET ACCOUNT 2's posts repeatedly displayed technical knowledge of the bitcoin blockchain, issues related to transactions, and user and data privacy.

62.     For example, on or about January 31, 2012, while responding to posts with the subject "The way US government can crack down Silk Road, Tor and Bitcoin," TARGET ACCOUNT 2 stated: "…Silk Road mainly sells drugs, that is already illegal, and apparently already enough reason to try to shutdown it and bitcoin, according to some polititions. [sic]"

63.    Also, on or about June 25, 2013, in response to an online comment about hashes not being random, TARGET ACCOUNT 2 stated: "Hash functions are NOT random.  Hash values of each block of bitcoin are because they are based on the block data which depends on the behavior of the whole network."

64.    Another example, on or about July 7, 2013, in response to an online comment saying "If you are NOT a criminal money laundering is NOT a crime!", TARGET ACCOUNT 2 stated: "If you are not a criminal, it's not called money laundering.  If all your money sources are legit and taxed, you can't or will want to lauder the money, you will just use it and nobody will have any problems with it.  Earning money and not paying tax on it, while still living in the country that needs those taxes and using the services it provides for those taxes is a crime though."

65.    Also, on or about July 18, 2013, in response to an online comment about bitcoin transaction volume, TARGET ACCOUNT 2 stated: " The scalability is the number one problem stopping Bitcoin from becoming mainstream … right now the blockchain keeps all the old information which is not even needed."

***Attribution of Killdozer (TARGET ACCOUNT 2) to ROMAN STERLINGOV***

66.    As described above, STERLINGOV was the account holder of the heavydist@gmail.com (Google Account 1) email address.  Records obtained from Google indicate that on multiple occasions, STERLINGOV sent and received email communications in this account where he refers to himself or is referred to by other parties as "Killdozer."

67.    Notably, on or about May 24, 2012, Google Account 1 sent an email in the Swedish language to mats@henricson.se where he tells the recipient of the email that his username on BitcoinTalk.org is Killdozer.  The body of the email contains numerous typos but reads: "Hej

24

Mats, jag är en kille från Göteborg, finns på bitcoin.se och bitcointalk som "Killdozer." Tänkte bara säga, räkna med mig, mycket bra iniav det här (synd a det inte är i gbg bara :))". Translated to English, the body of the email reads as follows: "Hi Mats, I'm a guy from Gothenburg, ns nns on bitcoin.se and bitcointalk as "Killdozer." Just thought to say, count on me, very good iniav this (pity a it is not in gbg only :))".

68.    Google Account 1 also contained emails dated January 20, 2013, and February 15, 2013, from the "Media Wiki Mail," email address wiki@bitcoin.it, which is associated with the Bitcoin Wiki, a wiki established in 2010 that served as a popular resource for the Bitcoin community. The emails were addressed to "Killdozer <heavydist@gmail.com>." The January email pertained to the registration of an account on the Bitcoin Wiki using the name "Killdozer"; the February email pertained to a password reset for the same account.

69.    On April 26, 2012, STERLINGOV was involved in an email exchange with a support representative from a file sharing software, Total Commander, using the email address spam@plasmadivision.com. The plasmadivision.com domain was used by STERLINGOV to sign up for accounts at Mt. Gox and Liberty Reserve in his own name. In the email with Total Commander, STERLINGOV explained his reason for wanting to register with the username "Cray Killdozer":

**Subject:** Re: Total Commander registration for Cray Killdozer **From:** spam@plasmadivision.com **Date:** 4/26/2012, 4:04 AM **To:** "Christian Ghisler" <support@ghisler.com>

Dear Christian,

That name is no "gamer" name, it is the name I always use in my IT work, with my colleagues, and in all computer environments. That is my identity which I have been living with and used in

my work, and the only one I associate myself in those contexts. So you see, it would work perfectly as a pyschological copy protection of the program. I am a developer myself and as you surely understand, it is in the IT culture to use such names.

Please let me have this name on the license, I have used your program for a very long time and sincerely consider your program the single biggest time saver and overall computer experience improver ever made, it is the first one I install on every new system, it is the first one that starts every day as well. I recommend it to almost any other developer/power user I meet. So I thought that it seems only fair that I buy a real copy this time (instead of using the trial version, which is still very generous of you to let users do), considering how much I have been using it and going to use it. Please let this experience stay as magical as it is, by using the provided name which is the one that I use all the time in my work and any IT context.

Thank you. Sincerely, Cray.

On Apr 26, 2012 11:30 "Christian Ghisler" <support@ghisler.com> wrote: Dear Sir,

Thanks for your registration of Total Commander through TakeTwoSolutions.com!

It seems that "Cray Killdozer" isn't your real name, but some kind of gamer avatar name(?).

I'm sorry but this isn't possible. Why? The name in the title is the only (although only psychologic) copy protection of the program.

Therefore we require one of the following for the title: 1. The first/last name of an existing person 2. The name of a registered company (Inc/Ltd/SP z o.o. etc) 3. The name of a government institution or school 4. The unregistered name + the name of the person

Best regards

Christian Ghisler Author of Total Commander

   70. On August 29, 2011, STERLINGOV used his Killdozer account (TARGET ACCOUNT 2) on BitcoinTalk.org to troubleshoot technical issues regarding a bitcoin-related application he was attempting to run on his computer. The posts included screenshots showing the username "heavydist."

71.     IP logs obtained from BitcoinTalk.org showed that on multiple occasions, the Akemashite Omedetou account (TARGET ACCOUNT 1) and the Killdozer account (TARGET ACCOUNT 2) logged in from the same IP address:

| Date Time | IP | Account |
|---|---|---|
| 10/25/2011 15:45 | 137.56.163.46 | AKEMASHITE OMEDETOU |
| 10/27/2011 18:31 | 137.56.163.46 | AKEMASHITE OMEDETOU |
| 1/14/2012 13:13 | 137.56.163.46 | KILLDOZER |
| 1/10/2012 2:55 | 146.185.23.179 | AKEMASHITE OMEDETOU |
| 1/10/2012 3:00 | 146.185.23.179 | AKEMASHITE OMEDETOU |
| 1/15/2012 21:36 | 146.185.23.179 | KILLDOZER |
| 2/8/2012 14:05 | 146.185.23.179 | AKEMASHITE OMEDETOU |
| 9/18/2011 15:50 | 173.254.192.36 | KILLDOZER |
| 12/13/2011 0:45 | 173.254.192.36 | AKEMASHITE OMEDETOU |

Though these IP addresses were associated with anonymity-related services, it was nonetheless highly significant that both TARGET ACCOUNT 1 and TARGET ACCOUNT 2 used the same IPs.

**BACKGROUND CONCERNING PROVIDER'S ACCOUNTS**

72.     In my training and experience, and based on my review of BitcoinTalk.org's website, I have learned the following:

73.     BitcoinTalk.org owns and operates a free-access public message board and social networking site of the same name that can be accessed at http://www.BitcoinTalk.org. BitcoinTalk.org allows users to create their own accounts through which they may post public messages or send private messages to other users.

74.     To create a BitcoinTalk.org account, a BitcoinTalk.org user must select a unique username and account password, and the user may provide an email address for the account.

75.     BitcoinTalk.org asks users to provide basic contact information, either during the registration process or thereafter.  This information may include the user's email address and other personal identifiers.  In my training and expertise, such information may be used to identify the account's user or users.  Based on my training and expertise, I know that even if subscribers enter false information to conceal their identities, this information often provides clues to their identity, location, or illicit activities.

76.     For each user, BitcoinTalk.org may retain information regarding the date and time when the user's profile was created, the date and time at which the account was created, and the Internet Protocol ("IP") address at the time of sign-up.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access a given BitcoinTalk.org account.

77.     BitcoinTalk.org also keeps IP logs for each user.  These logs contain information about the user's logins to BitcoinTalk.org including, for each access, the IP address assigned to the user and the date stamp at the time the user accessed his or her BitcoinTalk.org profile.

78.     BitcoinTalk.org users post public messages on public bulletin boards, referred to as forum posts.  The forum posts are typically dedicated to the discussion of specific topics of common interest mostly related to bitcoin and the virtual currency space.  The forum posts are made by BitcoinTalk.org users.

79.     Depending on a variety of factors, including how long ago the account was created and whether the account has sent any bitcoin to BitcoinTalk.org, users have certain ranks and permissions on BitcoinTalk.org.  The administrators impose restrictions on newcomers as far as opening posts with new topics.

80. In addition to posting publicly, a BitcoinTalk.org user can also send private messages to other BitcoinTalk.org users. These messages are typically visible only to the sender and the recipient.

81. Each BitcoinTalk.org post or message includes a timestamp that displays when the message was posted to BitcoinTalk.org.

82. As explained herein, information stored in connection with a BitcoinTalk.org account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a BitcoinTalk.org user's account information, email address, IP log, stored electronic communications, and other data retained by BitcoinTalk.org, can indicate who has used or controlled the BitcoinTalk.org account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, communications, public posts (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the BitcoinTalk.org account at a relevant time. Further, BitcoinTalk.org account activity can show how and when the account was accessed or used. For example, as described herein, BitcoinTalk.org logs the IP addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of BitcoinTalk.org access, use, and events relating to the crime under investigation. Lastly,

29

BitcoinTalk.org account activity may provide relevant insight into the BitcoinTalk.org account owner's state of mind as it relates to the offense under investigation. For example, information on the BitcoinTalk.org account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a criminal plan) or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

83. Based on my training and experience, I know that evidence of who controlled, used, and/or created a BitcoinTalk.org account may be found within the user-generated content created or stored by the BitcoinTalk.org subscriber. In addition, based on my training and experience, I know that this type of user-generated content can provide crucial identification evidence, whether or not it was generated close in time to the offenses under investigation. This is true for at least two reasons. First, people that commit crimes involving electronic accounts typically try to hide their identities, and many people are more disciplined in that regard right before (and right after) committing a particular crime. Second, earlier-generated content may be quite valuable, because criminals typically improve their tradecraft over time. That is to say, criminals typically learn how to better separate their personal activity from their criminal activity, and they typically become more disciplined about maintaining that separation, as they become more experienced. Finally, because online accounts and similar BitcoinTalk.org accounts do not typically change hands on a frequent basis, identification evidence from one period can still be relevant to establishing the identity of the account user during a different, and even far removed, period of time.

84. Based on my training and experience, I believe that data stored by BitcoinTalk.org in connection with the above services may contain evidence of the substantive crimes under

investigation, as well as evidence of the account holders' geographic location and the true identity and/or aliases of the account holders.

85.     Based on the foregoing, I submit that there is probable cause to believe that in the accounts held by BitcoinTalk.org, there exists evidence, fruits, and instrumentalities of the Subject Offenses. Thus, I respectfully request that the Court issue the proposed search warrant. Because the warrant will be served on BitcoinTalk.org, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## REQUEST TO SUBMIT WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

86.     I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant.  I submit that Assistant United States Attorney Christopher B. Brown, an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

## **CONCLUSION**

87.     Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on PROVIDER, who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.  Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

Leo Rovensky
Special Agent
Internal Revenue Service – Criminal
Investigation

Subscribed and sworn telephonically pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3)
on August 9, 2022.

_____
HONORABLE ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE

32

### <u>CERTIFICATE OF AUTHENTICITY OF DOMESTIC</u>
### <u>RECORDS PURSUANT TO FEDERAL RULES OF</u>
### <u>EVIDENCE 902(11) AND 902(13)</u>

I, _____, attest, under penalties of perjury by the laws

of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in

this certification is true and correct. I am employed by _____, and my title is

_____. I am qualified to authenticate the records attached hereto

because I am familiar with how the records were created, managed, stored, and retrieved. I state

that the records attached hereto are the original records or true duplicates of the original records

in the custody of BitcoinTalk.org. The attached records consist of BitcoinTalk.org

(pages/CDs/megabytes). I further state that:

a.       all records attached to this certificate were made at or near the time of the

occurrence of the matter set forth by, or from information transmitted by, a person with

knowledge of those matters, they were kept in the ordinary course of the regularly conducted

business activity of BitcoinTalk.org, and they were made by BitcoinTalk.org as a regular

practice; and

b.       such records were generated by BitcoinTalk.org electronic process or system that

produces an accurate result, to wit:

1.       the records were copied from electronic device(s), storage medium(s), or

file(s) in the custody of BitcoinTalk.org in a manner to ensure that they are true duplicates of the

original records; and

2.      the process or system is regularly verified by BitcoinTalk.org, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____
Date

_____
Signature

_____
Name and Title